UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

KATHLEEN HERROLD,                    )
                                     )
         Plaintiff,                  )
                                     )
              v.                     )          Case No. 2:10-CV-00489-JD
                                     )
MICHAEL J. ASTRUE,                   )
Commissioner of Social               )
Security,                            )
                                     )
         Defendant.                  )

## OPINION AND ORDER

Plaintiff Kathleen Herrold ("Herrold") filed a complaint on December 14, 2010 [DE 1]

seeking review of the final decision of the Defendant Commissioner of Social Security

("Commissioner"). With the filing of the opening brief [DE 18], response brief [DE 23], and

reply brief [DE 24], this matter is ripe for ruling.

Herrold initiated her disability claim by filing an application for disability insurance

benefits on November 6, 2007, alleging disability beginning on June 1, 2007 due to two brain

cysts, stenosis in the spine, carpal tunnel syndrome in her left hand, and thoracic pain syndrome.

(Tr. 85-86, 179-87). Her application was denied on July 1, 2008, and again on reconsideration

on October 2, 2008. (Tr. 87-89, 97-99). Herrold requested a hearing which was held on August

31, 2009 before Administrative Law Judge Mona Ahmed ("ALJ"). (Tr. 44-84). Herrold was

represented by counsel, and the ALJ heard testimony from Herrold (Tr. 49-73), Herrold's mother

Maryanne Pietrzycki (Tr. 73-79), and Vocational Expert Michelle Peters ("VE") (Tr. 79-84). On

January 27, 2010, the ALJ issued a decision concluding that Herrold was not disabled under the

meaning of the Social Security Act ("the Act") because she retained the residual functional

capacity ("RFC")[1] to perform jobs that exist in significant numbers in the national economy. (Tr.

39).

On February 22, 2010, Herrold filed a request for review to the Appeals Council. (Tr. 17,

19). The Appeals Council denied the request for review on September 15, 2010, making the

ALJ's opinion the final decision of the Commissioner. (Tr. 6-8). On December 14, 2010,

Herrold filed a complaint in this Court seeking judicial review of the Commissioner's final

decision [DE 1]. Jurisdiction is established pursuant to 42 U.S.C. § 405(g).

## I. Factual Background

Kathleen Herrold was 43 years old at the time of her onset date, and 46 years old at the

time of the ALJ's decision. (Tr. 38, 142). Herrold graduated from high school and has taken

some college courses, and she was employed as a child care worker. (Tr. 50-51, 181). Since her

alleged onset date of June 1, 2007, Herrold has not performed substantial gainful activity. (Tr.

25). Herrold was insured for purposes of the Act's status requirements through June 30, 2012.

(Tr. 25).

## A.   Impairments

As the ALJ noted, the record reflects a long history of treatment for a variety of pain

complaints, dating many years prior to Herrold's alleged onset date. (Tr. 29).

On November 8, 2005, neurologist Dr. Preeti Devnani completed a neurological

consultation report indicating that Herrold presented with complaints of numbness and tingling

in her left arm and leg since one and a half years ago, which is when she also noticed that the left

---

[1]Residual Functioning Capacity is defined as the most a person can do despite any physical and mental
limitations that may affect what can be done in a work setting. 20 C.F.R. § 404.1545(a)(1).

2

side of her face and neck would become numb. (Tr. 422-23).  She reported a painful sensation in her face and burning in her left leg which extended from her hip to her foot.  She had no complaints of back pain or weakness in the left arm or leg.  She also complained of headaches which could reach an intensity of 5-10/10, lasted from 3-5 hours, and occurred 1-5 times a week. She recalled an incident of lost vision while driving 3 years ago, but she continued to drive without further consequence.  She reported treatment for depression 7 years ago.  At the time, she worked in a daycare and did not take any pain medication.  During the examination, she appeared depressed and had multiple crying bouts.  Her exam revealed mild light touch decrease on the left side of her face, but her motor examination revealed normal tone, with no atrophy, 5/5 strength, and symmetrical reflexes. Her sensory exam showed mild decrease on the left as compared to the right arm and leg.  Her position sense was normal and her gait was unremarkable.  It was noted that she was being treated for depression by a community psychiatrist, and that a review of her chart should be conducted to see if a stoke work-up was performed.  Dr. Devnani also noted that Herrold's nerve conduction study of her upper extremities reflected a normal study with unremarkable results. (Tr. 424-26).

A year later, in November 2006, Herrold began treating with neurologist Dr. Andrea DeLeo for pain in the left side of her body. (Tr. 343-46, 349-51).  Dr. DeLeo noted that Herrold reported constant pain without relief, an episode in 2000 when she was driving and lost her vision which subsequently returned, and a history of migraines.  Dr. DeLeo reported that Herrold's strength in her arms and legs was 5/5, that light touch revealed allodynia over the left hemisoma, and that she had mild diminution in vibratory and position sense in the pretibial regions.  Dr. DeLeo suspected that Herrold had thalamic syndrome or central nervous system

3

demyelinating disease, so he ordered a series of tests.

On December 22, 2006, registered occupational therapist Cathy Mistovich completed a Balance and Movement Disorder Evaluation and noted that Herrold complained of left-sided numbness and pain that was present for 4-5 years, and Herrold described her pain as constant numbness, aching, and burning with shooting pains that started from the left side of her head and traveled down to her feet. (Tr. 334-35).  Mistovich reported that Herrold's pain ranged from a level 4 to a level 10, that her range of motion, strength, and sensation on the right side were all within normal limits, but that she experienced decreased sensory abilities on the left side. Herrold's overall normal gross and fine motor coordination were within normal limits, her balance and gait tests were all within normal limits, and Herrold showed overall normal movement and balance.  Mistovich reported that Herrold was independent with her basic activities of daily living and opined that no further occupational therapy treatment was indicated.

In January 2007, Dr. DeLeo discussed Herrold's test results with her which indicated normal findings except that she had left carpel tunnel syndrome and an arachnoid cyst in the supracerebellar cistern and dilated perivascular space with small vessel changes. (Tr. 343-46, 349-51).  Her cervical spine MRI revealed a slight generalized disc bulge at C4-5 and a mild generalized disc bulge at C5-6 with no foraminal encroachment noted at any of the spinal root levels, her thoracic MRI showed right and left facet changes, and her lumbar MRI revealed multi-level stenosis at L4-5 with mild to severe foraminal stenosis at multiple levels.  Dr. DeLeo diagnosed Herrold with thalamic pain syndrom and ordered additional testing, including auditory and visual evoked response studies, to evaluate her subjective complaints of left face numbness and tingling.  After the tests were taken, the results were discussed with Herrold on June 26,

2007. (Tr. 254-348).  Dr. DeLeo's impressions were that Herrold suffered from right basal ganglia arachnoid cyst and supracerebellar arachnoid cyst for which Herrold received nonsurgical findings from Dr. Kaakaji, history of migraine headaches for which Esgic was recommended, multilevel thoracic region stenosis and multilevel L2-S1 stenosis, and left atypical facial pain with chronic paroxysmal hemicrania for which Lyrica was recommended.

On February 6, 2007, Herrold was involved in a motor vehicle accident, at which time Herrold complained of upper back, neck, and right hand pain, and she was diagnosed with having received a right hand contusion and a neck/lumbar strain; however, her cervical spine x-ray and right hand x-ray revealed no abnormalities. (Tr. 289-90, 352-55).

In August 2007, Herrold began treatment with a pain management center, at which time Herrold complained of chronic debilitating pain to her left side which began approximately 5 years ago. (Tr. 377-400).  She was initially evaluated by nurse practitioner Anjanette Zielinski, who noted that Herrold's most prevalent pain was on the left side of her face which felt like a crushing, burning, and stabbing pain. It was noted that she was taking Ziac, Zoloft, Soma, Ultram, and Vicodin, and that she was 5 foot tall and weighed 168 pounds.  Zielinski noted that despite a weakness in Herrold's left facial muscles and asymmetry on the left side of her face, Herrold's upper and lower extremities demonstrated equal range of motion, tone, and strength at 5/5.  Herrold's neck was without spasm or tenderness, her range of motion was intact, and she demonstrated a stable, steady, and non-antalgic gait.  Zielinski's impression was left sided pain of undetermined etiology, and she recommended trying Lyrica in escalating doses, Zanaflex to allow for improved sleep, Ultram for severe breakthrough pain, and Kadian as a long-acting pain reliever to substitute for Vicodin and Ultram.

5

On September 17, 2007, Zielinski noted that Herrold's physical exam remained unchanged, but her pain was reduced, she was able to do more activities, her mood was stable and not tearful, she moved well from sitting to standing, and she had a good passive and active range of motion in her cervical spine and upper extremities. (Tr. 377-400). Zielinski increased her Lyrica and Kadian, changed Zanaflex to Baclofen, and added MSIR (morphine sulfate immediate release) for severe breakthrough pain.

On October 8, 2007, Zielinski noted that Herrold began using MSIR daily, which was not intended given that when it was prescribed Herrold was doing quite well and was tolerant of her pain. (Tr. 377-400). Zielinski documented her concern that Herrold was developing an over-reliance on medications, and therefore the prescription was not continued. Herrold was reported as having a stable, steady, non-antalgic gait, she moved well from sitting to standing, she showed no overt motor deficits and no strength or sensory deficits, and she was diagnosed as having facial pain and axial neck pain with radiculopathy. Her medications for Lyrica and Kadian were continued, and she was given Elavil to help with her pain.

On September 12, 2007, Herrold was seen by physical therapist Olga Mendez-Stankevich who noted that Herrold was experiencing facial pain, cervical pain, myofascial pain of the thoracic, lower back, and left upper extremity, and decreased range of motion in all cervical movements. (Tr. 491-95). Herrold reported that pain interferes with her daily activities, driving is difficult, and pain interrupts her sleep. Herrold's upper extremity strength was 3/5 on both sides, and she was able to grip 20 pounds with each hand. A skilled physical therapy program was recommended and her rehab potential was thought to be good, secondary to patient motivation.

On October 3, 2007, Herrold underwent a patient evaluation with Accelerated Rehab Centers, and she received physical therapy on October 3, 11, 16, and 18, and on November 1, 5, and 7, 2007 (Tr. 358-72) which consisted of therapeutic exercises, strengthening exercises, upper extremity grip strengthening, proprioception, soft tissue massage, joint mobilizations, analgesic and anti-inflammatory modalities, cervic traction, and a home exercise program. Upon her initial evaluation, Herrold complained of pain on the left side of her face and whole left side of her body and rated her pain as a 7 out of 10. Physical therapist Renee Spanburg gave Herrold treatment goals which included increasing her range of motion in her cervical spine, restoring her scapular stability to 5/5, performing all functional activities including driving without limitations and pain, and increasing her grip strength by 10 pounds. Herrold's final progress report of November 7, 2007 and discharge summary of January 2, 2008, indicated that she had increased range of motion and had increased her grip strength by 10 pounds in each upper extremity, but she had not reached her goals of increasing her cervical spine range of motion by 10 degrees in all directions, restoring her scapular stability to 5/5, or restoring her ability to perform all activities without limitations. Herrold still complained of numbness down her left upper extremity and continued left side facial pain.

Herrold was examined by pain management specialist Dr. Mohammed Uddin on November 12, 2007, at which time Herrold's chief complaint was pain which involved multiple areas of her body since 2002, including headaches, left-sided facial pain which radiated to her neck and left upper extremity, and groin and lower back pain which radiated to her left lower extremity. (Tr. 394-96). She reported taking only Lyrica, Zoloft, and Ziac for her pain. Her brain cyst was noted as stable. She weighed 168 pounds, had tenderness in the facet joint line of the

cervical spine with increased pain upon extension, rotation, and bending to the left, tenderness in the lumbar facet joint area mostly on the left side with increased pain upon extension to the left, and her left straight leg test was positive.  Her motor exam was intact throughout and she had hyperalgesia on the left side of her face. Dr. Uddin opined that her atpyical facial pain could be related to the brain cyst, that her headaches could be stress or ambulation related, that her axial low back pain was related to her lumbar facet joint disease, and her lumbar radiculopathy was related to her lumbar foraminal stenosis and disc bulges.  Dr. Uddin reported that Herrold also suffered from mild anxiety and obesity.  Dr. Uddin recommended steroidal injections and continued use of Lyrica, Kadian, and Baclofen, with the hope of getting her off of the opioids by using injections.

On December 3, 2007, Herrold had an office visit with Dr. Uddin where her Lyrica and Kadian were increased for her pain (Tr. 393), and on December 4, Herrold received a lumbar epidural steroid injection for her low back pain, lumbar disc herniation, and lumbar radiculopathy  (Tr. 390-92).  Although the first injection helped significantly, it lasted for a short time and the pain started to return.  Thus, she received a second lumbar epidural steroid injection on January 7, 2008, and Dr. Uddin recommended that she have an MRI done on her brain and spine. (Tr. 388-89).  She was prescribed Lodine for anti-inflammatory purposes and methadone 5 mg twice a day to serve as her short and long acting pain medication.

In January 2008, Herrold's MRI results showed a stable brain cyst, cervical multilevel spondylosis, including facet arthropathy and degenerative disc disease causing foraminal stenosis on the left side, disc protrusion, and moderate stenosis in the lumbar spine.  (Tr. 387, 401-09, 421).  Dr. Uddin's impression was that Herrold had axial neck pain, cervical spondylosis

and degenerative disc disease, and lumber radiculopathy and thalamic pain syndrome.  He

recommended a cervical facet joint injection and cervical medial branch radiofrequency ablation.

Thus, on February 18, 2008, Herrold received a cervical medial branch block to treat her axial

neck pain, headaches, cervical spondylosis, and facet arthropathy (left side dominant). (Tr. 385).

Noting on February 25 that the benefit of the block was not significant (Tr. 384), she received a

second cervical medial branch block on March 10, 2008. (Tr. 382-83). On March 24, it was

found that the facet joints were the pain generator and Herrold reported that her neck and head

felt much better for a long time. (Tr. 378-81).  Dr. Uddin decreased her Lyrica due to blurred

vision, and recommended a cervical radiofrequency neurotomy to relieve the pain for a longer

period of time, and this procedure was performed on March 3.

On April 8, 2008, Herrold saw nurse practitioner Susan Fazekas and noted that she was

experiencing an increase in left side cervicogenic headaches. (Tr. 377).  Herrold received a

Toradol injection.

On April 21, 2008, Herrold complained of axial low back pain which radiated to her

lower right extremity, as well as the left lower extremity. (Tr. 484-85).  She received a lumbar

transforaminal epidural steroid injection on the right side on April 21, 2008.  Also, her morphine

was discontinued because of escalating dose requirements, and she was given Percocet for only 2

weeks to help with her breakthrough pain and discomfort in her back, leg, neck and head.  On

April 25, 2008, it was noted that Herrold experienced nausea because of the Percocet, so she was

given Tylenol No. 4 and Neurontin 300 mg twice a day on an as needed basis. (Tr. 483).  On

May 5, 2008, Dr. Uddin saw Herrold and noted that she was doing well after the cervical

radiofrequency for her neck pain, and she was doing well after the lumbar transforaminal

epidural steroid injection for her back and leg pain. (Tr. 482).  He noted that she was "doing well with her medical management."  There was no tenderness in the axial cervical spine or axial lumbar spine, and flexion and extension did not cause any tenderness, except minimally.  She was doing well with Lyrica and Tylenol No. 4, and he gave her Ambien to see if it would help her sleep.

Also on May 5, 2008, Dr. Siddiqui performed a consultative examination for Herrold, at which time she complained of disability due to headaches, left facial and body pains, neck pain, lower back pain, depression and anxiety. (Tr. 428-31).  She reported that physical therapy and epidural injections in the cervical and lumbar spine did not improve her pain.  She reported that she was frequently dropping things from her left hand due to numbness and tingling in her left upper extremity.  She also reported having difficulty performing her job due to problems gripping with her left hand, and performing household chores due to her left body pain, numbness, depression, and anxiety.  Dr. Siddiqui noted that she was an overweight female (weighing 196 pounds) with a normal gait, who ambulated without an assistive device and got on and off of the examining table without any difficulty.  She had a decreased range of motion of her cervical and lumbosacral spine, with tender muscles on the left side of her body, but she was able to squat and walk on her heels and toes. Her muscle strength and grip was 5/5 on her right side, and -5/5 on her left side. She was able to pick and grip coins well with both hands separately.  Dr. Siddiqui's impression was that she suffered from persistent headaches with a history of an arachnoid cyst, neck pain possibly due to bulging cervical disc disease with degenerative joint disease and spondylosis of the cervical spine, lower back pain due to degenerative and herniated discs, left hyperthesias, depression, anxiety disorder, and chronic

10

sinusitis.

On May 16, 2008, Herrold saw Dr. Uddin and reported that her major problem was getting to sleep, but noted that pain was not causing her to lose sleep. (Tr. 480-81). Dr. Uddin reported that Herrold was doing better with her neck, low back, and leg pain, that she had no tenderness in the axial cervical or lumbar spine, that flexion and extension of the trunk did not cause any tenderness, straight leg tests were negative, and her motor and sensory functions were the same. Herrold was treated with Lunesta, and she was to continue taking Lyrica, Neurontin, Tylenol No. 4, and the Duragesic Patch.

On May 30, 2008, Dr. Uddin noted that Herrold reported an aggravation of neck pain on her right side. (Tr. 479). He noted that she had minimal tenderness in her cervical facet joint area on the right side with increased pain upon extension, rotation, and bending to the right. He noted her hypersensitivity on the left side of her face compared to her right. Because Herrold was leaving for vacation, Dr. Uddin only had time to conduct a cervical facet joint injection (instead of a radiofrequency), which was completed on the right side on June 2, 2008. (Tr. 477-79).

On June 12, 2008, a physical RFC assessment was conducted by the state agency consultant Dr. J.V. Corcoran. (Tr. 433-40). Dr. Corcoran indicated that Herrold could occasionally lift and carry up to 20 pounds, and frequently lift up to 10 pounds; and she could stand and/or walk for about 6 hours in an 8 hour workday, and sit for about the same amount of time. She had no push/pull limitations. Dr. Corcoran also indicated that Herrold could occasionally climb, balance, stoop, kneel, crouch, and crawl. She had no limitations established relative to her ability to manipulate (reach, handle-gross manipulation, finger-fine manipulation,

and feel), and no visual, communicative, or environmental limitations.  Dr. Corcoran noted that Herrold's impairments were expected to cause limitations but not to the extent alleged by Herrold.

On June 25, 2008, Dr. Uddin noted that Herrold was doing better with her neck and head pain, but she was still experiencing some pain and trouble sleeping. (Tr. 475).  He reported minimal tenderness in her axial lumbar and cervical spine, but no signs of radiculitis in her back and leg.  Because Lyrica was giving her blurred vision, her dose was reduced and she was told to continue taking Baclofen and Neurontin, and a reduced fentanyl patch was to be covered by taking Norco.

On July 1, 2008, state agent Dr. Joelle Larsen performed a psychiatric review assessment. (Tr. 443-55).  Dr. Larsen diagnosed Herrold with depression and anxiety disorder, but concluded that the impairments were not severe.  Dr. Larsen opined that Herrold had no restrictions on her activities of daily living; mild difficulties with maintaining social functioning; mild difficulties with maintaining concentration, persistence, or pace; and no episodes of decompensation, and no evidence establishing the presence of C criterion of any listed impairments enumerated in the Listing of Impairments found in 20 C.F.R. pt. 404, Subpt. P, Appendix 1 (referred to as Listings).  Noting that Herrold only alleged physical conditions, but that Dr. Siddiqui diagnosed her with depression and anxiety, Dr. Larsen received clarification from Dr. Siddiqui which indicated that Herrold presented with a "depressed mood" on the day she was evaluated by Dr. Siddiqui.  Dr. Larsen also noted that Herrold was taking medicine but had no psychiatric treatment or hospitalizations.  Despite feeling depressed at times, Dr. Larsen noted that Herrold performs a variety of daily activities, gets along well with others, shops and handles finances,

12

and has good attention, concentration, and task persistence.  He found Herrold to be credible as consistent with the objective evidence.

On July 9, 2008, Herrold returned to Dr. Uddin reporting that she was doing well, but still had some symptoms. (Tr. 473).  Dr. Uddin noted minimal tenderness in her cervical and lumbar spine and adjusted her medications.  On August 1, 2008, Herrold complained that her facial pain was aggravating, but it was noted that she had no sensory deficits with her face, her cranial and oculomotor nerves were intact bilaterally, and her upper extremity sensory and motor examinations were intact bilaterally. (Tr. 471).  She did present with tenderness in the lower back, increased pain upon extension, rotation, and bending on the right side more than the left, and her straight leg raising exam was positive on the right side but negative on the left side.  Her prescription for Lyrica was increased, her other medications were continued, and on August 5, she received a lumbar transforaminal epidural steroid injection on S1 on the left side and on L4-L5 on the right side. (Tr. 469-71). On August 20, Dr. Uddin noted that the injection helped significantly with the radicular pain on both of her lower extremities, but her pain problem is now with her axial low back, more on the right side (Tr. 468). She had tenderness on the right facet and sacroiliac joint line, and presented positive on the right side during Patrick and Gaenslen tests (used to detect abnormalities with the lumbar vertebrae and sacroiliac joint). Therefore, Herrold received a sacral lateral branch block and lumbar medial branch block on September 16, 2008. (Tr. 466-67).  The following day, Dr. Uddin noted that she was doing well with the previous treatment but started having neck pain on the right side. (Tr. 458).  Therefore, Dr. Uddin noted that it was necessary to determine and confirm the pain generator on the right side, which was previously done on the left side and helped significantly. (Tr. 458).  Herrold

received a subsequent cervical medial branch block on the right side on September 18. This resulted in some improvement but the pain started to return, and therefore Dr. Uddin recommended a radiofrequency procedure to prolong the effect of the pain relief since the diagnostic block helped significantly. (Tr. 462).  Thus, on September 25, she had a cervical radiofrequency neurotomy completed on her right side with a followup that would take place in October. (Tr. 462-65, 500-01).

On September 2, 2008, Herrold visited neurologist Dr. George Abu-Aita for a neurological evaluation because of her history of chronic pain. (Tr. 523-24).  Dr. Abu-Aita noted that Herrold was taking Ziac, Prempro, Effexor, Valium, Duragesic patches, Norco as needed, Lyrica, and Lunesta as needed at night.  She weighed 186 pounds, and denied headaches, dizziness, nausea, vomiting, chest pain, or shortness of breath.  She had some low neck and back tenderness, but a good range of motion, and her neurological exam was unremarkable including cranial nerves, motor, sensory, and cerebellar testing, and her deep tendon reflexes were brisk but symmetrical and negative for Babinski signs.  Dr. Abu-Aita diagnosed Herrold with two congenital cysts and noted that she had a history of chronic pain syndrome mostly in her neck, back, and left side, but she was on "so many medications for that."  He determined that no further neuro recommendation was needed and prescribed a gradual increase in Lyrica to deal with her pain.

On September 30, 2008, state agent Dr. R. Fife, reviewed all of the evidence in the file and affirmed state agency consultant Dr. J.V. Corcoran's decision of June 12, 2008. (Tr. 502).

On October 22, 2008, Dr. Uddin reported that Herrold's radiofrequency neutotomy on the right side helped her significantly, as she was doing "75% better in her neck and headache."  (Tr.

14

549).  He also noted that she "feels more energy; her functional capacity, her quality of life, and activities of daily living have all improved. She feels much better and looks more jovial today." Herrold had tenderness in the facet joint line of the lumbar spine on both sides, with increased pain when extending, bending, and rotating to the right, otherwise the physical exam was within normal limits.  Dr. Uddin decided to continue her medication until after she returned from her cruise, at which point he would try to wean her off of her medication.

On October 24, 2008, optometrist Dr. Anthony Guadagno noted that he had treated Herrold for three years and he concluded that he was able to correct Herrold's visual acuity with glasses. (Tr. 527).  He also noted that she has suffered bilaterally from keratoconjunctivitis sicca and epithelial basement dystropy, and that he has been able to manage her dry eye symptoms well with eye drops. A threshold field test indicated deep relative superior and paracentral scotomas OU, and he concluded that the defects were not the result of any ocular health issues but probably associated with her brain cysts.

In late October 2008 through early 2009, Herrold sought treatment with psychiatrist Dr. Mohammed Arshad, who noted Herrold's depression, anxiety, sadness, agitation, and irritability. Dr. Arshad prescribed Xanax and Lunesta.  (Tr. 512-20, 540).

On November 19, 2008, Herrold visited Dr. Uddin to discuss pain management during her impending travel to Europe, and she received a Toradol injection. (Tr. 548).  Dr. Uddin noted that her straight leg examination was negative, but flexion and extension still caused some discomfort.  Dr. Uddin reviewed her MRI and noted that she had lumbar disc herniation, facet arthropathy, and occasional radiculitis.

15

On December 2, 2008, Herrold received a lumbar medial branch block and sacral lateral branch block (on the left side). (Tr. 546-47). On December 10, she saw Dr. Uddin with complaints of a headache in the back of her head which traveled up to the back of her ear and below her eye, more on the left side than the right side. (Tr. 545). His impression was that Herrold had sacroiliac joint disease, lumbar facet joint disease, left side dominant and cervicogenic headaches, cervical spondylosis, and pain in the maxillary sinuses and cervical area of the left side. Because Norco was not helping anymore, Dr. Uddin prescribed Tylenol No. 4, recommended that she have an x-ray of the maxillary sinus area to exclude any active sinusitis, and recommended a radiofrequency neurotomy on the left side to help with the sacroiliac joint pain. Herrold received a radiofrequency neurotomy of the lumbar medial branches and dorsal ramus and a sacral lateral branch block (on the left side) on December 30, 2008. (Tr. 542-43). Also, a December 26, 2008 x-ray indicated unremarkable paranasal sinuses. (Tr. 544).

On January 21, 2009, Dr. Uddin noted that her lower back pain was improving after the radiofrequency ablation was done, and her neck pain and headache were improved on the right side after the September radiofrequency was done. (Tr. 541). However, she started having pain in the neck and head on the left side dominantly, and reported that Dr. Aita told her that it was not caused by the site. Herrold had tenderness in the facet joint line of the cervical spine on the left side, with increased pain upon extending, bending, or rotating to the left, but her sensory and motor exam in her upper extremities was intact bilaterally. He recommended that she start taking Dilaudid and have a cervical radiofrequency done on her left side, given that she had the same problem back in 2007 and it helped her for about 10 months.

16

On February 18, 2009, Dr. Siddiqui noted that Lyrica was causing Herrold weight gain, so he decreased the dose, and placed her on Kadian and Loradol. (Tr. 576-77).  On March 25, Dr. Siddiqui noted that she lost 30 pounds since decreasing the Lyrica, but she was having axial cervical pain and left facial numbness, and therefore her prescription was changed. (Tr. 574-75). On May 20, 2009, Dr. Siddiqui reported that she was having chronic cervical and lumbosacral pain with a limited range of motion and tenderness. (Tr. 573).  He noted that she was discharged from the pain clinic due to receiving narcotics from multiple providers.

On June 1, 2009, Dr. Rajive Adlaka, who is board certified in anesthesia and pain management, examined Herrold for facial, lower back, and neck pain. (Tr. 581-82).  He noted that she has complained of these symptoms for several years, but has never seen a spine surgeon. Herrold reported seeing a neurosurgeon in the past, but he did not recommend any neurosurgical treatment.  Dr. Adlaka noted that she was taking Ziac, Zoloft, and Neurontin.  She presented with a flat affect, and her physical exam revealed that her gait was within normal limits, she walked heel to toe without difficulty, but flexion, extension, and right and left lateral rotation were moderately painful and she had tenderness to the spine. Her neck revealed some bilateral paracervical tenderness with moderate pain upon flexion, extension, and right and left rotation. Her lower and upper extremity examinations revealed that motor and sensory functions were intact, reflexes were +2, and all tests were negative.  She was trembling after the exam and stated that it was due to the pain.  After reviewing her medical records, Dr. Adlaka recommended another series of epidural injections and if there was no improvement, then possible surgical intervention would be recommended, but he did not believe that she was a good candidate for long-term narcotic management. (Tr. 583).  On June 30, Dr. Adlaka administered a

transforaminal epidural steroid injection (on the left side). (Tr. 579). On July 13, Herrold reported that she was 20% better overall, and yet she had not decreased usage of hydrocodone. (Tr. 578). Dr. Adlaka recommended repeating the epidural injection, putting her on Duragesic patches, and if she did not progress, then he would recommend diagnostic discography and surgical referral.

On July 19, 2009, she treated at the emergency room due to pain all over, and was released with lumbar radiculitis and hypertension. (Tr. 589-91). Herrold reported that she had no prior hospitalizations due to back problems and no history of uncontrolled or chronic pain, but she did have a history of chronic back problems.

On July 28, 2009, Herrold's treating physician Dr. Siddiqui performed a Medical Assessment of Ability to do Work-Related Activities (Physical) for Herrold. (Tr. 595-97). Dr. Siddiqui found that Herrold had the following restrictions: she could lift and carry less than 20 pounds for up to 2/3 of an 8 hour workday (due to her lumbar disc herniation, cervical radiculopathy, and back, neck, and left body pain); she could stand and walk up to 4 hours in an 8 hour day, but only up to 2 hours without interruption (due to lower back pain which increases with prolonged walking and standing); she could sit 6 or more hours in an 8 hour workday, but only up to 1 hour without interruption (due to the previous set of reasons listed); she could climb, stoop, crouch, kneel and crawl up to 1/3 of an 8 hour workday and she could balance up to 2/3 of an 8 hour workday (due to the previous set of reasons listed); and, she could not push or pull heavy objects (due to the previous set of reasons listed). Dr. Siddiqui also noted that Herrold did not require an ambulatory device or periods of rest in a reclining position during an 8 hour period, but she should not work around moving machinery. He also indicated that "at times" she

has difficulty gripping and holding with the left hand due to hyperalgesia, and she does have

anxiety, depression, and "cognitive problems" due to her depression.

**B.      Testimony of Claimant**

On August 31, 2009, Herrold testified before the ALJ. (Tr. 49-73).  Herrold testified that

she drives to doctors' appointments 4 or 5 times a week, and she drives to the grocery store and

to her 15 year old daughter's school.  Herrold graduated from high school and has an

accreditation in early childhood development.  Herrold last worked in June 2007 as a child care

provider, however, she quit working because she was having trouble taking care of the children

and she started dropping things and burning herself while trying to cook for them.  Herrold has

not looked for a job since, and does not believe that she could work due to the pain that she has

when sitting or standing, the pressure in her face, migraines, and pain, numbness, and tingling

down her spinal cord into her left arm, middle back, lower back, leg, and toes.  She testified that

she is going to see another neurologist at the University of Chicago in order to determine what is

causing her pain.

Herrold testified that the day before the hearing she went furniture shopping for

approximately 2 ½ – 3 hours.  After shopping, she ate lunch and then went home, at which time

she visited with her cousin for a couple of hours. She then rested "a bit," and then made her bed,

cleaned the kitchen, watched TV, and made sure her daughter completed her homework, but

between tasks she rested by sitting down and relaxing her back.   Herrold testified that she and

her husband went on vacation for 10 days in the Mediterranean in 2008, where they went on

some bus trips and foot tours, but she came back exhausted.

She testified that her injections were never effective, except for one that she had done on

her left shoulder which lasted only one month, and she noted that the radiofrequency helped for maybe one month. She considered the option of surgery, but decided it was too risky. As of the date of the hearing, only Dr. Siddiqui prescribed her medications, which included Zoloft, Premarin, Ziac (for high blood pressure), Fentanyl patch (for pain), Oxycodone, and Neurontin (for nerve pain). Herrold testified that she has approximately 2 good days a week where although the pain is present, including shooting pain, it is managed and she can function unassisted. However, she also has about 1 or 2 bad days a week when she has pain from her face down to her toes and she is almost bed-bound. Her medications make her tired and occasionally force her to sleep 3-4 hours more than usual. She testified that her medication caused her confusion, namely she "stumble[s] around with [her] words" or has trouble with word finding. When asked if she could concentrate enough to work, she said that she could not because when she was working she started having migraines and pain in her face and she was afraid that she would drop the infants.

On her bad days, Herrold stated that she needed assistance to do simple things such as getting in the shower because it was difficult for her to lift her legs due to the burning (shooting) sensation from her face to her legs, which can occur 3-10 times a day. Herrold described flashes in her eyes when she has pain in her face and migraines. She said that this type of pain has never occurred while she was driving.

Herrold testified that she has struggled mentally to deal with the pain and has become somewhat anti-social as a result. Herrold testified that she cries every day, and that she thinks that the pain is causing it. She talks to her psychiatrist, Dr. Mohammed Arshad, about dealing with the pain, and has been prescribed Zoloft to help her, as well as Xanax to deal with panic

attacks.

**C.     Testimony of Claimant's Mother**

Herrold's mother, Mary Ann Pietrzycki, testified before the ALJ. (Tr. 73-79).  Pietrzycki

moved in with Herrold in December 2006 after visiting Herrold and finding that Herrold was

struggling with headaches and pain, even though Herrold was still working.  Since moving in,

Pietrzycki believes that Herrold's condition has become worse.  In particular, Herrold has

headaches that force her to stay in bed for several days.  Pietrzycki further testified that she takes

care of the family and the house "95 percent" of the time because Herrold is unable to do so

because of her pain.

Pietrzycki noticed that when Herrold is in particularly bad pain, the left side of her face

hangs "like a stroke."  Herrold would blame it on severe headaches and shooters.  In addition,

Pietrzycki noted that there were times when Herrold was confused, stumbled around, and seemed

easily exhausted. Pietrzycki testified that she believed Herrold under-exaggerates her pain and

how it really affects her daily activities.

**D.     Testimony of the Vocational Expert**

VE Michelle Peters testified during the hearing. (Tr. 79-84).  The VE confirmed that she

was familiar with the social security regulations regarding vocational considerations, that she

was familiar with jobs in the regional and national economy, and that she was familiar with the

Dictionary of Occupational Titles (DOT). (Tr. 80).  The ALJ instructed the VE to let her know if

any of her testimony "differs in anyway with information in the DOT," and the VE indicated that

she would notify the ALJ of any differences. (Tr. 80).  The VE testified that Herrold's child care

attendant job was classified by the DOT as a low-end semi-skilled occupation with an SVP[2] of 3 and medium physical demand, which was consistent with the VE's review of the records. (Tr. 80-81).

The ALJ gave the VE several hypothetical situations.  In the first hypothetical, the ALJ asked the VE to consider a person who: can lift, including push and pull, a maximum of 10 pounds frequently; can stand and walk up to 4 hours, no more than 2 hours at a time; can sit at least 6 hours, no more than 1 hour at a time; cannot climb ladders, ropes, or scaffolds; can occasionally[3] kneel, crouch, crawl, stoop, and climb ramps or stairs; and cannot work around heights or hazards.  (Tr. 81).

The VE testified that "based on that hypothetical" there would be approximately 1,200 information clerk positions, 1,200 inspection type positions, and 200 assembly type positions available. (Tr. 81).  When prompted by the ALJ, the VE confirmed that all of these jobs were unskilled, light exertion, and also fell within the lifting and standing restrictions that the ALJ provided in the hypothetical. (Tr. 81-82).

Next, the ALJ added a limitation that handling (gross manipulation) with the left, non-dominant hand could be done frequently, but not constantly. (Tr. 82).  Based on the hypothetical, the VE indicated that no jobs would be eliminated because the jobs were within the weight limitation. (Tr. 82).

When the ALJ increased the limitation to only occasional handling, the VE ruled out the

---

[2]SVP stands for "specific vocational preparation," or the DOT's way of measuring the amount of time required by a typical worker to learn the techniques, acquire the information, and develop the abilities needed for average performance in a specific work situation.

[3]"Occasionally" means occurring from very little up to one-third of the time. SSR 83-10.

inspection positions and assembly positions because these jobs required the ability to use bilateral extremities on a frequent basis, but the information clerk positions would not be eliminated. (Tr. 82).

Finally, on cross-examination, the VE testified that if a hypothetical person had to miss 2-3 days of work per week due to heavy pain medication that would require the individual to be in bed all day, then all substantial gainful activity would be eliminated. (Tr. 83).

E.      Opinion of the ALJ

The ALJ determined that Herrold met the insured status requirements of the Act through June 30, 2012, and that Herrold had not engaged in substantial gainful activity since the alleged onset date of June 1, 2007. (Tr. 25).  The ALJ further determined that Herrold had the following severe impairments: degenerative disc disease in the lumbar and cervical spine and arachnoid cyst. *Id*. The ALJ noted that although Herrold was diagnosed with other conditions, including ophthalmologic conditions, depression and anxiety, which were considered throughout the ALJ's discussion, the other conditions only had a minimal impact on Herrold's ability to do basic work activities, and in any event, the second step of the analysis was satisfied as long as there was at least one severe impairment.[4] *Id*.

The ALJ found that Herrold did not have a severe mental impairment because she was only mildly limited in her activities of daily living, her social functioning, and in her

---

[4]Consistent with SSR 86-8, an impairment is not severe if it is a slight abnormality or combination of slight abnormalities which would have no more than a minimal effect on the individual's physical or mental ability to perform basic work activities.  Furthermore, step two is merely a threshold analysis that requires the claimant to show only that she has at least one severe impairment. *See Golembiewski v. Barnhart*, 322 F.3d 912, 918 (7th Cir. 2003) ("Having found that one or more of [the claimant's] impairments was 'severe,' the ALJ needed to consider the aggregate effect of the entire constellation of ailments-including those impairments that in isolation are not severe."); *Hickman v. Apfel*, 187 F.3d 683, 688 (7th Cir. 1999) ("[I]t is quite apparent that severity is merely a threshold requirement, for not all severe cases will (either medically or functionally) meet or equal an impairment" in the Listings).

concentration, persistence, or pace, and she had not experienced any episodes of decompensation that lasted an extended duration. (Tr. 26-27). The ALJ also noted that the record did not indicate that Herrold's depression or anxiety otherwise limited her ability to do basic work-related activities. (Tr. 27).

Next, the ALJ determined that Herrold had the RFC to lift 10 pounds frequently; stand or walk 4 hours (2 hours at a time); sit at least 6 hours (1 hour at a time); and, she could occasionally kneel, crouch, crawl, stoop, and climb ramps or stairs, but she was unable to climb ladders, ropes or scaffolds, or work at heights or around hazards. (Tr. 27).

The ALJ determined that while Herrold was unable to perform her past relevant work because it required the ability to perform at a medium level of exertion, she was able to perform jobs that existed in significant numbers in the national economy. (Tr. 38). Relying on the testimony of the VE, the ALJ determined that an individual with Herrold's RFC, age, education, and work experience was capable of performing the jobs identified by the VE as information clerk, assembler,[5] and inspector. As a result, the ALJ concluded that Herrold was capable of making a successful adjustment to other work that existed in sufficient numbers and was therefore "not disabled" under the meaning of the Act. (Tr. 39).

## II. Standard of Review

Since the Appeals Council denied Herrold's request for review, the decision of the ALJ is the final decision of the Commissioner. *Liskowitz v. Astrue*, 559 F.3d 736, 739 (7th Cir. 2009). In its review, the district court will affirm the Commissioner's findings of fact and denial of disability benefits if they are supported by substantial evidence. *Craft v. Astrue*, 539 F.3d 668,

---

[5]The ALJ stated that there were 1,500 assembler jobs available, when in fact, the VE testified that there were only 200 assembler type jobs available. *Compare* Tr. 39 *with* Tr. 81.

673 (7th Cir. 2008).  Substantial evidence consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales,* 402 U.S. 389, 401 (1971).  This evidence must be "more than a scintilla but may be less than a preponderance." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007).  Thus, even if "reasonable minds could differ" about the disability status of the claimant, the Court must affirm the Commissioner's decision as long as it is adequately supported. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).

In this substantial-evidence determination, the Court considers the entire administrative record but does not reweigh evidence, resolve conflicts, decide questions of credibility, or substitute the Court's own judgment for that of the Commissioner. *Lopez ex rel. Lopez v. Barnhart,* 336 F.3d 535, 539 (7th Cir. 2003).  Nevertheless, the Court conducts a "critical review of the evidence" before affirming the Commissioner's decision, and the decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues. *Id.*  Ultimately, while the ALJ is not required to address every piece of evidence or testimony presented, the ALJ must provide a "logical bridge" between the evidence and the conclusions. *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009).

Further, conclusions of law are not entitled to deference; so, if the Commissioner commits an error of law, reversal is required without regard to the volume of evidence in support of the factual findings. *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997).

### III.  Analysis

Disability benefits are available only to those individuals who can establish disability under the terms of the Social Security Act. *Estok v. Apfel*, 152 F.3d 636, 638 (7th Cir. 1998). Specifically, the claimant must be unable "to engage in any substantial gainful activity by reason

of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).  The Social Security regulations create a five-step sequential evaluation process to be used in determining whether the claimant has established a disability. 20 C.F.R. § 404.1520(a)(4)(i)-(v).  The steps are to be used in the following order:

1. Whether the claimant is currently engaged in substantial gainful activity;

2. Whether the claimant has a medically severe impairment;

3. Whether the claimant's impairment meets or equals one listed in the regulations;

4. Whether the claimant can still perform relevant past work; and

5. Whether the claimant can perform other work in the community.

*Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001).  If the claimant is performing substantial gainful activity or does not have a severe medically determinable impairment, or a combination of impairments that is severe and meets the duration requirement, then the claimant will be found not disabled. 20 C.F.R. § 404.1520(a)(4)(i)-(ii).  At step three, if the ALJ determines that the claimant's impairment or combination of impairments meets or equals an impairment listed in the regulations, disability is acknowledged by the Commissioner. 20 C.F.R. § 404.1520(a)(4)(iii).  However, if a Listing is not met or equaled, in between steps three and four, the ALJ must then assess the claimant's RFC, which, in turn, is used to determine whether the claimant can perform her past work under step four and whether the claimant can perform other work in society at step five of the analysis. 20 C.F.R. § 404.1520(e).  The claimant has the initial burden of proof in steps one through four, while the burden shifts to the Commissioner in

step five to show that there are a significant number of jobs in the national economy that the claimant is capable of performing.  *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004).

Herrold alleges that the ALJ committed 3 primary errors:  (1) the ALJ's credibility determination was not adequately supported; (2) the ALJ's RFC determination was not supported by substantial evidence because she failed to consider all of Herrold's limitations; and (3) because the RFC was erroneous, the step five hypothetical to the VE did not include all relevant limitations, and the ALJ failed to resolve conflicts with the VE's testimony and the DOT which then led to an improper finding that a significant number of jobs existed that Herrold could perform.

## A.    Credibility

Herrold argues that the ALJ committed error by failing to comply with SSR 96-7p in discounting her testimony. [DE 18 at 17-20; DE 24 at 8-11].

Because the ALJ is in the best position to observe witnesses, an ALJ's credibility determination will not be upset on appeal so long as it finds some support in the record and is not patently wrong. *Herron v. Shalala*, 19 F.3d 329, 335 (7th Cir. 1994).  Indeed, "[o]nly if the trier of facts grounds his credibility finding in an observation or argument that is unreasonable or unsupported can the finding be reversed." *Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006).  However, as a bottom line, SSR 96-7p requires an ALJ to consider the entire case record and articulate specific reasons to support his credibility finding. *Golembiewski v. Barnhart*, 322 F.3d 912, 915-17 (7th Cir. 2003).  Further, while an ALJ is not required to provide a complete written evaluation of every piece of testimony and evidence, an ALJ cannot simply state that an

27

individual's allegations have been considered or that the individual's allegations are not credible. *Rice v. Barnhart*, 384 F.3d 363, 370 (7th Cir. 2004); SSR 96-7p.

The process for evaluating a claimant's symptoms is organized around two major steps. First, the claimant must provide objective medical evidence of a medically determinable impairment or combination of impairments that reasonably could be expected to produce the alleged symptoms. 20 C.F.R. § 404.1529(a), (b).  In Herrold's case, the ALJ found that her medically determinable impairments could reasonably be expected to cause her alleged symptoms. (Tr. 29-38).

Second, after the first step is satisfied by the claimant, the ALJ must then evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities. 20 C.F.R. § 404.1529(a).  While an ALJ may not reject subjective complaints of pain solely because they are not fully supported by medical testimony, the ALJ may consider that as probative of the claimant's credibility. *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000); SSR 96-7p.  The regulations identify seven examples of the kinds of evidence the ALJ considers, in addition to objective medical evidence, when assessing the credibility of an individual's statements:

> (1) the individual's daily activities; (2) the location, duration, frequency, and intensity of the individual's pain or other symptoms; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or symptoms; (5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; (6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); (7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. § 404.1529(c); SSR 96-7p.  The ALJ should not mechanically recite findings on each factor, but must give specific reasons for the weight given to the individual's statements. SSR 96-7p.

Reviewing the ALJ's opinion, the Court concludes that the ALJ adequately considered the evidence of record in making her credibility determination.  The ALJ noted that Herrold alleges disability due to brain cysts, stenosis in the spine, carpal tunnel syndrome in the left hand, and thoracic pain syndrome, and the ALJ noted that Herrold has also received psychiatric treatment.  The ALJ summarized Herrold's testimony concerning her pain and other symptoms by noting that Herrold described experiencing pressure in her face, horrible migraines, numbness and tingling from the spine to the left arm which radiated to her toes, constant back pain whether sitting or standing, horrible burning pain as if her skin was being peeled off, and terrible shooting pain on the top of her head 3-10 times a day on bad days which felt like an ice pick was going through her head.  The ALJ further considered Herrold's own description of her limitations, including the fact that she must rest and relax her back, that she cannot sit for a long period of time, and that she sometimes cannot lift her legs to take a shower.  The ALJ considered the fact that Herrold did not testify to limitations caused by her depression and anxiety, except that she sometimes had difficulty word finding.  The ALJ also considered the testimony of Herrold's mother, who stated that Herrold has terrible migraines, her face hangs down, she spends several days in a row sleeping, and she only occasionally has good days.

The ALJ documented that Herrold felt that neither acupuncture or the many injections relieved her pain, and that her various medications made her feel tired, less alert, and sometimes

caused confusion with word finding. The ALJ noted that Herrold considered the possibility of surgery but thought it was too risky.

After consideration of the hearing testimony, the ALJ then identified the extensive evidence of record that called Herrold and her mother's credibility into question, including the following: Herrold's clinical examinations which consistently documented her left face tenderness and occasional observation of facial weakness or droopiness, but did not show significant weakness, motor loss, or reflex abnormalities related to her disc problems, and only sometimes reflected a limited range of motion; Dr. DeLeo's January 2007 conclusion that despite Herrold's complaints of ongoing left hemisensory loss and dysesthesias, his examination did not support these findings and revealed only subjective sensory changes; Herrold's lack of treatment for mild carpal tunnel syndrome; Herrold's consultative examination which revealed that despite having decreased grip strength in her left hand, she was able to grip a coin well in both hands separately, and her motor examination of her upper extremities was (and has been) intact; the lack of psychiatric notes from Dr. Arshad documenting any significant cognitive problems, but rather revealing adequate cognition; Herrold's demonstrated alertness during the hearing and ability to provide a detailed chronology of her problems; the lack of corroborating evidence concerning the degree to which Herrold indicated that her medications affected her—beyond making her less alert and requiring adjustments; Herrold's current description of her pain as "shooting," when during the course of her treatment Dr. Uddin indicated that she was doing well and her injections were fairly effective in addressing each area of the body where she reported pain; Dr. Siddiqui's treating physician opinion that Herrold was capable of work activity with some limitations specifically noted; the opinions of the state agent consultants

which indicated that Herrold was capable of performing light work with additional postural limitations; the lack of other medical opinions suggesting that Herrold was as limited as she testified; the lack of any evidence showing a worsening in her condition since the time when Herrold worked for many years despite having pain and headaches; and, the fact that Herrold engaged in a wide range of activities requiring several hours of sitting and standing/walking. The ALJ further detailed the findings made by Dr. Siddiqui, Dr. Uddin, Dr. Arshad, and the state agents relative to Herrold's physical and cognitive limitations, and explained how these records factored into her decision.[6]

Moreover, in determining that Herrold's statements concerning the intensity, persistence, and limiting effects of her symptoms were not entirely credible, the ALJ noted that she takes Zoloft, Premarin, hypertension medication, Fentanyl patches, Oxycodone, and Neurontin, which make her tired and at a loss for words on occasion, but they did not cause her memory problems. The ALJ explained that she considered the fact that Herrold has utilized various measures for pain relief, including acupuncture, physical therapy, injections and radiofrequency procedures, and strong narcotics. The ALJ detailed Herrold's ability to travel and drive 4 or 5 times a week to the store or to her daughter's school, her ability to shop for several hours, and her ability to complete light chores and visit with family. Even though Herrold's mother indicated that Herrold was unable to care for herself and her family, the ALJ explicitly explained that this testimony was not enough to overcome the more probative evidence—the treatment notes of Dr. Uddin and opinion of Dr. Siddiqui. The ALJ also considered Herrold's good work history, but explained that this factor did not outweigh all of the other factors discussed.

---

[6]*See infra* at pp. 38-48 for the Court's discussion regarding whether the ALJ adequately explained her reasons for relying on or rejecting medical sources.

Thus, after stating that the claimant was not entirely credible, the ALJ in this case adequately supported her finding with evidence from the record, by specifically discussing Herrold's work history; her daily activities; the location, intensity, and frequency of her pain; factors that seemed to aggravate or alleviate her symptoms; the various types of medication and other treatment that she has received; the documented effectiveness of her treatment; the documented side effects and resulting adjustments made to her medications; the testimony of her mother; the objective medical evidence; and, the information provided by the physicians, the psychiatrist, and the state agents. Thus, the ALJ complied with 20 C.F.R. § 404.1529(c) and SSR 96-7p, and gave specific reasons for the weight that she gave to Herrold's statements.

Even so, Herrold makes a number of specific allegations of error relative to the ALJ's discrediting of her testimony, and the Court addresses each argument in turn.

First, any argument by Herrold that the ALJ failed to recognize the side effects of her medications or the effectiveness of her treatment for pain is simply without merit. As the Court's discussion makes clear, the ALJ set forth Herrold's various treatments, including her use of acupuncture, physical therapy, injections, radiofrequency procedures, and strong medications. The ALJ noted when the medications were adjusted, she noted Herrold's complaints that her medications caused her to be tired and have trouble word finding, and she noted the lack of effectiveness complained of by Herrold. The ALJ also noted the testimony of Herrold's mother who reported that Herrold suffered from incapacitating pain. Admittedly, the testimony of Herrold and her mother concerning Herrold's limitations, along with supporting medical evidence, may itself be sufficient to support a finding of disability even in the absence of objective medical findings. *See Carradine v. Barnhart*, 360 F.3d 751, 753 (7th Cir. 2004).

32

However, here the ALJ explained that while objective diagnostic studies revealed abnormalities that would cause Herrold to experience pain, Herrold and her mother's testimony that she was suffering debilitating side effects from ineffective treatment was somewhat overstated as evidenced by her daily activities, her presence at the hearing, the objective medical evidence, the reports and opinions of her treating physicians, and the opinions of the state agents. In particular, the ALJ specifically referred to Herrold's ability to do a wide range of activities for extended duration during the course of her treatment. The ALJ relied on Dr. Uddin's various medical records which indicated that Herrold's treatment for each body part was effective. The ALJ also specifically relied on Dr. Siddiqui's opinion that despite Herrold's pain and other problems, she was capable of performing work activity with few limitations. In addition, the ALJ noted that the state agent medical consultants indicated that Herrold was capable of doing light work with some additional postural limitations.

Herrold may disagree with the ALJ's ultimate conclusion that Herrold's medications did not cause the side effects she claimed (other than some word finding issues and tiredness), and Herrold may disagree with the ALJ's ultimate conclusion that her treatments for pain and other symptoms were more effective than Herrold suggested—but the ALJ made these conclusions by adequately explaining the facts upon which she relied which constituted substantial evidence.[7] The Court cannot reweigh this evidence or substitute its own judgment for that of the Commissioner. *See Lopez ex rel. Lopez,* 336 F.3d at 539.

Second, the Court does not agree with Herrold that the ALJ "improperly equated Herrold's minimal activities of daily living as evidence of an ability to perform light unskilled

---

[7]*See infra* at pp. 38-48 for the Court's discussion regarding whether the ALJ adequately explained her reasons for relying on or rejecting medical sources.

work." *See* 20 C.F.R. § 404.1572(c).  Instead, the ALJ recanted the testimony about Herrold's daily activities, her needing rest, and her inability to sometimes get out of bed. *See* 20 C.F.R. § 1573(c).  But then, the ALJ discounted this testimony based again on the objective medical evidence, the opinion of her treating doctor who specifically opined that she was capable of performing sustained work activity, the opinions of the state agents, the factors found in SSR 96-7p, and Herrold's admitted wide range of activities which included driving, traveling, and shopping for several hours even the day before the hearing. *See Jelinek v. Astrue,* 662 F.3d 805, 812 (7th Cir. 2011) (noting that an ALJ may consider a claimant's daily activities when assessing credibility, but the ALJ must explain perceived inconsistencies between a claimant's activities and the medical evidence); *Arnold v. Barnhart*, 473 F.3d 816, 823 (7th Cir. 2007) (the claimant's preferred means of coping with his symptoms–taking frequent breaks–was not medically necessary given the compelling evidence).  Therefore, the ALJ did not fail to consider the difference between Herrold's ability to engage in physical daily activities and her being able to work eight hours a day five consecutive days of the week. *See Carradine*, 360 F.3d at 755-56. Instead, the ALJ in this case provided sufficient explanation for why the record evidence did not support Herrold's alleged need for additional rest periods, and for why the record evidence supported a finding that she was capable of performing sustained work on a consistent basis. Further, the ALJ properly considered Herrold's ability to perform activities of daily living as only one factor among the various factors required to be addressed when analyzing credibility. As a result, the credibility determination will not be disturbed.

Third, the Court also does not agree with Herrold's assertion that the ALJ found "fault" with Herrold's not seeking surgical intervention.  Instead, the ALJ properly noted the fact that

34

Herrold considered the recommendation for surgery, but decided not to have surgery because it would be very risky. *See McKinzey v. Astrue,* 641 F.3d 884, 890-91 (7th Cir. 2011) (noting that the ALJ has an obligation to consider the claimant's explanation for failing to seek surgery before drawing an adverse inference). Here, the ALJ did not discount Herrold's facially valid reason for declining surgery. Instead, the ALJ simply noted the fact that Herrold testified to declining surgical intervention due to its risks. The ALJ then proceeded to discuss the fact that Herrold sought various other forms of treatment to control her pain, which "weighed in the claimant's favor." *See* SSR 96-7p. Because the ALJ is permitted to consider the treatment that Herrold has undergone to relieve her symptoms, *see* SSR 96-7p, the ALJ did not error in this respect.

Fourth, the Court also disagrees with Herrold that it was improper for the ALJ to conclude that "[w]hile the use of strong pain relievers is often a good indicator of pain, I am less confident about drawing such a conclusion when there is concern about medication overuse." (Tr. 37). The ALJ made this conclusion after referencing the fact that Dr. Uddin's nurse expressed concern about Herrold's overuse of narcotics and the fact that Dr. Uddin himself had discharged Herrold from his pain practice due to a violation of the narcotic contract—a fact which Herrold admitted was true. Again, the ALJ is entitled to consider Herrold's treatment history and other factors when evaluating Herrold's credibility, *see* 20 C.F.R. § 404.1529(c), and therefore, the ALJ did not error in taking these records into consideration along with the other record evidence.

Finally, the Court finds that the ALJ took Herrold's complaints of pain seriously, even if the exact etiology of her pain was uncertain. Indeed, the ALJ confirmed that she had "no doubt

that the claimant does have some pain" but that given the record evidence discussed, the ALJ was "not convinced that [the pain was] as severe or limiting as described" and while Herrold "allege[d] significantly greater limits, her claims [were] not fully credible." (Tr. 38). Given the ALJ's extensive discussion concerning how she evaluated the credibility of Herrold's statements, the Court finds that the ALJ's determination of Herrold's credibility was not "unreasonable or unsupported," *Prochaska*, 454 F.3d at 738, and was not "patently wrong." *Herron*, 19 F.3d at 335. Thus, in light of the substantially supported credibility determination, the ALJ's evaluations shall receive the court's deference. Accordingly, the ALJ did not error in making her determination that Herrold's statements concerning the intensity, persistence and limiting effects of her symptoms were not credible.

**B.     RFC Determination**

Although Herrold's RFC argument is convoluted and raises a series of undeveloped arguments, the Court understands Herrold's argument to be that in determining Herrold's RFC, the ALJ failed to consider all of her medical records which demonstrated that she suffered additional limitations, especially with regard to her pain, hand impairments, depression/anxiety, and obesity. Herrold further faults the ALJ for inadequately explaining the manner in which she partially relied on Dr. Siddiqui's opinion in formulating the RFC. Therefore, Herrold argues that the ALJ's RFC determination was not supported by substantial evidence.

The ALJ must determine the claimant's RFC before performing steps four or five. *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004); 20 C.F.R. §§ 404.1520, 404.1545; SSR 96-8p. RFC is an assessment of the work-related activities a claimant is able to perform on a regular and continued basis despite the limitations imposed by an impairment or combination of

36

impairments. *Id*. This finding must be assessed based on all the relevant evidence in the record. 20 C.F.R. § 404.1545(a). The ALJ must consider all medically determinable impairments, even if not considered "severe," 20 C.F.R. § 404.1545(a)(2), and the RFC must be supported by substantial evidence. *Clifford v. Apfel*, 227 F.3d 863, 873 (7th Cir. 2000).

The ALJ has final responsibility for deciding a claimant's RFC, which is a legal decision rather than a medical one. 20 C.F.R. §§ 404.1546(c), 404.1527(e). A reviewing court is not to substitute its own opinion for that of the ALJ's or to reweigh the evidence, but the ALJ must build a logical bridge from the evidence to his conclusion. *Haynes v. Barnhart*, 416 F.3d 621, 626 (7th Cir. 2005). Consequently, an ALJ's decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues. *Lopez ex rel. Lopez*, 336 F.3d 535, 539 (7th Cir. 2003). Further, an ALJ must evaluate both the evidence favoring the claimant as well as the evidence favoring the claim's rejection and may not ignore an entire line of evidence that is contrary to his findings. *Golembiewski v. Barnhart*, 322 F.3d 912, 917 (7th Cir. 2003); *Zurawski v. Halter*, 245 F.3d 881, 888 (7th Cir. 2001). Nevertheless, an ALJ need not provide a written evaluation of every piece of testimony and evidence. *Golembiewski*, 322 F.3d at 917. Instead, an ALJ need only minimally articulate his justification for accepting or rejecting specific evidence of disability, *Berger v. Astrue*, 516 F.3d 539, 545 (7th Cir. 2008); *Rice v. Barnhart*, 384 F.3d 363, 371 (7th Cir. 2004), and he is required to determine which treating and examining doctors opinions should receive weight and must explain the reasons for these findings. 20 C.F.R. § 404.1527(d), (f).

Herrold first contends that the ALJ "highlighted reports of [Herrold] doing well" while failing to address "evidence of extensive treatment with blocks, injections, prescribed morphine,

physical therapy, multiple spinal MRIs and x-rays, MRIs confirming brain cysts, notation of cognitive problems, perpetual evidence of facial pain and drooping, depression, anxiety, cervicogenic headaches, axial neck pain and cervical spondylosis." [DE 18 at 12-13; DE 24 at 2-3]. Herrold then makes the blanket assertion that the ALJ failed to consider all of the relevant evidence. *Id.*

However, it is evident from the ALJ's extensive decision that she did not fail to discuss (nor did she simply "dispense" with) the favorable evidence.  Rather, the ALJ conducted a thorough examination of Herrold's objective medical history, considered the relevant medical opinions in the record, and explained why certain medical evidence was afforded more weight than other evidence.

Relative to Herrold's complaints of pain, physical impairments, and cognitive limitations, the ALJ acknowledged Herrold's "long history of treatment for a variety of pain complaints" (Tr. 29) and thereafter summarized Herrold's extensive medical records, including neurologist Dr. Devnani's November 2005 records, neurologist Dr. DeLeo's November 2006-June 2007 records, nurse practitioner Zielinski's August-October 2007 pain management records, physical therapy records from October-November 2007; pain management specialist Dr. Uddin's November 2007-January 2009 medical records; Dr. Siddiqui's May 2008 consultative medical examination and February-July 2009 records, neurologist Dr. Abu-Aita's September 2008 evaluation; psychiatrist Dr. Arshad's October 2008-early 2009 treatment notes; and Dr. Adlaka's June-July 2009 records.  Importantly, the ALJ's summary of these records accurately portrayed their contents—including facts favorable to Herrold, such as: mild decreases in sensory exams; left facial drop; diagnoses for thalamic and central pain syndrome; diagnoses for axial neck pain,

cervicogenic headache, and cervical spondylosis left side dominant; MRI results revealing cysts in the brain and degenerative changes, bulges, and stenosis in the spine; EMG results showing left carpal tunnel syndrome; signs of weakness of the left facial muscles; side effects of and adjustments to medications including morphine; Herrold's completion of physical therapy with continued complaints of left face pain and left arm numbness; positive straight-leg, Patrick, and Gaenslen tests; mild anxiety and obesity; depression and crying bouts; decreased ranges of motion; increased tenderness; decreased strength in the left lower and upper extremity; reports that pain returned after some treatments; and, frequent return for epidural steroid injections, various branch blocks, and radiofrequency procedures in different areas of her body.

While the ALJ may not have produced a written evaluation on every piece of evidence, she was not required to do so, *see Rice*, 384 F.3d at 371; but, to suggest that the ALJ cherry-picked from the medical records and considered only the non-favorable evidence to support a denial of benefits is baseless.  In fact, the ALJ specifically addressed all of the evidence that Herrold points out, although she did not assign the significance to it that Herrold prefers.  The ALJ described Herrold's battle with pain, and noted that "each time the claimant experiences improvement in one part of the body or one side, she later develops pain in another area or another side.  But in the end, each of these areas was addressed with relative success." (Tr. 37).

In reaching this conclusion the ALJ noted her reliance on Dr. Uddin, Dr. Siddiqui, and Dr. DeLeo's records and opinions.  Notably, these treating physician opinions which concern the nature and severity of Herrold's medical condition's were entitled to controlling weight if the opinions were supported by the medical findings and were consistent with substantial evidence in the record. *Skarbeck v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004) (citing 20 C.F.R. §

404.1527(d)). Ultimately, the ALJ may discount a treating physician's opinion as long as the ALJ minimally articulates his reasons for doing so. *Berger v. Astrue*, 516 F.3d 539, 545 (7th Cir. 2008).  The Seventh Circuit has deemed this deferential standard to be "lax."  *Id.*  The ALJ must also determine what weight the physician's opinion is due under the applicable regulations. 20 C.F.R. § 404.1527(d); *see Larson v. Astrue*, 615 F.3d 744, 751 (2010).

Here, the ALJ accepted Dr. Uddin's various treatment notes indicating that Herrold experienced "effective treatment." Herrold would have the Court substitute its own judgment for the Commissioner's in this respect, but the Court cannot do so when the finding is supported by the substantial evidence.  The records show that Herrold was responding to Dr. Uddin's progressive treatment beginning one month after Dr. Uddin began treating Herrold.  For instance, as the ALJ pointed out, as early as December 2007, Dr. Uddin reported that she was being helped "significantly" by injections, but that relief lasted only a short time, so radiofrequency was then used to extend the duration of her pain relief. Also, the ALJ noted that in May 2008, Dr. Uddin reported that Herrold was "doing well" other than her inability to sleep, which was not caused by pain. The ALJ further referenced that in July 2008, Herrold was "doing well" compared to the past, but she still had symptoms, in August 2008 her injection helped "significantly," in October 2008 she reported 75% improvement with her neck and head pain, and in December 2008 she had "excellent" improvement on account of her diagnostic spine blocks (left side).  Thus, the ALJ's characterization of Dr. Uddin's records was not without record support.  Further, Dr. Uddin's records were not inconsistent with the other medical evidence which the ALJ discussed.

40

In particular, the ALJ specifically considered the fact that Herrold's diagnostic studies revealed that Herrold had brain cysts and disc abnormalities, and that it was reasonable that these problems were causing her to experience pain.  However, the ALJ then considered Dr. DeLeo's specific comment that Herrold's examination did not support her complaints of ongoing left hemisensory loss and dysesthesia.  The ALJ also referenced the fact that Herrold's clinical examinations were unremarkable.  The ALJ commented that the medical evidence indicated that the cysts were stable or congenital—a conclusion that the ALJ reached after noting that in June 2007, Dr. Deleo referenced Dr. Kaakaji's opinion which provided nonsurgical findings relative to her cysts; that in November 2007, Dr. Uddin reported that her tectal cystic lesion in her brain was stable and possibly related to her atypical facial pain; that in January 2008, the MRI of Herrold's brain noted that the CSF collection in the superior cerebellar cistern was stable and the dilated perivascular space was stable; and that in September 2008, Dr. Abu-Aita indicated that Herrold's small cyst in the inferior right basal ganglia and arachnoid cyst in the supra cerebellar cistern were likely congenital.

Not only did the ALJ rely on Dr. Uddin's treatment notes for Herrold, but the ALJ explained that her RFC assessment largely corresponded to Dr. Siddiqui's opinion.  Relative to Dr. Siddiqui's opinion, Herrold argues that although the ALJ relied partly on Dr. Siddiqui's opinion, the ALJ then failed to explain why she rejected the portions of Dr. Siddiqui's opinion which indicated that Herrold had a limited ability to grasp and manipulate objects and suffered limitations due to her depression and anxiety.

The Court does not agree that the ALJ failed to sufficiently explain herself and support her opinion with substantial evidence in this respect.  Instead, Herrold simply disagrees with the

significance that the ALJ assigned to Dr. Siddiqui's comments relative to further physical and cognitive limitations.

The Court's conclusion is reached after a thorough examination of the ALJ's opinion and the record evidence. In relying on Dr. Siddiqui's opinion, the ALJ noted that although Dr. Siddiqui was not a specialist, he was a treating physician who was familiar with Herrold and was aware of her treatment history and use of medications. *See* 20 C.F.R. 404.1527(d). The ALJ adopted Dr. Siddiqui's opinion that Herrold could stand and walk up to 4 hours in an 8 hour day, but only up to 2 hours without interruption; she could sit 6 or more hours in an 8 hour workday, but only up to 1 hour without interruption; she could climb, stoop, crouch, kneel and crawl up to 1/3 of an 8 hour workday, but she should not work around hazards (heights or moving machinery), and she could not climb ladders, ropes, or scaffolds. The ALJ explained that she gave Herrold a conservative lifting restriction of no more than 10 pounds, based on Dr. Siddiqui's belief that Herrold could lift and carry "less than 20 pounds" but did not think that she was limited to lifting only "less than 10 pounds."

The ALJ then noted Dr. Siddiqui's comment that "at times" Herrold has difficulty gripping and holding with the left hand, but the ALJ concluded that she was "not convinced that the claimant has any handling limitations on a regular and consistent basis." The ALJ explained that the basis of her conclusion was that although Herrold was diagnosed with mild carpal tunnel syndrome, her complaints of left arm/hand limitations were infrequent. Also, Dr. Siddiqui's comment was not specific and his own consultative examination revealed that while Herrold's left grip strength was decreased, she could still pick and grip a coin well with both hands separately. The ALJ noted that Dr. Siddiqui opined that Herrold could lift less than 20 pounds

42

occasionally and frequently. The ALJ also considered the fact that Herrold's motor examination of her upper extremities has been intact over time. Therefore, the ALJ concluded that additional hand limitations, beyond the weight restriction, were not necessary.

The ALJ also considered Dr. Siddiqui's comment regarding Herrold's "cognitive problems." The ALJ noted that the comment was "vague," and then referenced Dr. Arshad's psychiatric treatment notes which did not include many objective observations or a mental status exam. However, Dr. Arshad indicated that Herrold felt stress and depression related to her pain, but she was cooperative, attentive, interested, had goal directed thoughts, and she demonstrated immediate, recent, and remote memory, judgment, intelligence, orientation and insight. The ALJ noted that Dr. Arshad's treatment notes demonstrated that Herrold's mental conditions appeared stable and that she was taking medication that had been adjusted. The ALJ also explained that Herrold herself reported in June 2008 that her conditions do not cause difficulty with memory, completing tasks, concentration, understanding or following instructions, and she reported having a "good attention span." Even during the hearing, Herrold described problems with word finding, but she did not appear confused or show decreased alertness. The ALJ then explained that based on this record evidence, Herrold's depression and anxiety do not otherwise limit her ability to do basic work-related mental activities, and she was "capable of at least unskilled work despite any cognitive problem" because such work would require little judgment to do simple tasks that can be learned on the job quickly. (Tr. 27, 36). The ALJ further restricted Herrold to not working around heights or hazards to accommodate Herrold's lack of alertness.

In formulating Herrold's RFC, the ALJ also considered the opinions of the state agency medical consultants. Relative to her physical impairments, the ALJ referenced the opinions of

43

Dr. Corcoran and Dr. Fife who concluded (on June 12 and September 30, 2008, respectively) that Herrold could do light work with some additional postural limitations.[8]  The ALJ explained that she was persuaded by Dr. Siddiqui's opinion because he was a treating physician, but noted that the state agent opinions were reasonable based on the objective evidence and given that no other medical opinions suggested that the claimant was more limited.  Relative to her mental impairments, the ALJ considered the fact that state agent Dr. Larsen did not believe that Herrold suffered from any severe mental impairment, and opined that Herrold was able to perform a variety of daily activities; she got along well with others; and she had good attention, concentration, and task persistence.  The ALJ was entitled to consider the state agent sources, since she supported her position with substantial evidence (even though Herrold disagrees with the ultimate conclusion reached). 20 C.F.R. § 404.1527(f)(2)(i).

Moreover, after engaging in a lengthy credibility dialogue, as previously detailed in this Order, the ALJ also explained that he was not convinced that Herrold is as limited by her ailments or the side effects of her treatment as she and her mother claimed.

Therefore, in determining Herrold's RFC, the ALJ noted that she accepted Dr. Siddiqui's opinion with respect to her lifting and standing/walking/sitting limitations, as well as her inability to work around hazards and limited ability to kneel/crouch/crawl/stoop/climb.  In accepting these limitations, the ALJ explained that Dr. Siddiqui's opinion in this respect was accompanied with a sufficient explanation and was consistent with the other medical evidence

---

[8]Specifically, the state agents opined that Herrold could occasionally lift and carry up to 20 pounds, and frequently lift up to 10 pounds; she could stand and/or walk for about 6 hours in an 8 hour workday, and sit for about the same time; she had no push/pull limitations; she could occasionally climb, balance, stoop, kneel, crouch, and crawl; she had no limitations established relative to her ability to manipulate (reach, handle-gross manipulation, finger-fine manipulation, and feel); and she had no visual, communicative, or environmental limitations.

(as identified by the ALJ and previously detailed herein). *See* 20 C.F.R. 404.1527(d).  In

rejecting Dr. Siddiqui's passing comments concerning Herrold's cognitive problems or

gripping/handling problems, the ALJ explained that Dr. Siddiqui's comments in this respect

were not accompanied by any explanation or evidence to support them; but instead, the record

evidence (as identified by the ALJ and previously discussed herein) supported a determination

that no further limitations were necessary in the RFC finding. *Id.*; *see* SSR 96-2p (indicating that

a treating source's medical opinion may not be given controlling weight unless it is "well-

supported by medically acceptable clinical and laboratory diagnostic techniques" and "is not

inconsistent with the other substantial evidence in the case record").

On this record, the ALJ did not err in concluding that Herrold's mental conditions were

stable, and in concluding that the combination of her mental and physical conditions did not

affect her capacity to perform less than light unskilled work on a sustained basis. *See Denton v.

Astrue,* 596 F.3d 419, 426 (7th Cir. 2010) (citing *Luna v. Shalala*, 22 F.3d 687, 693 (7th Cir.

1994) (noting that the claimant "must furnish medical and other evidence that the ALJ can use to

reach conclusions about his medical impairment and its effect on his ability to work on a

sustained basis.")).

The Court also addresses Herrold's undeveloped argument that the ALJ "did not mention

or even consider" the limiting effects of her obesity for purposes of the RFC determination.

According to SSR 02-1p, an ALJ should consider the effects of obesity together with the

underlying impairments, even if the individual does not claim obesity as an impairment.

*Prochaska v. Barnhart,* 454 F.3d 731, 736 (7th Cir. 2006) (citing *Clifford v. Apfel*, 227 F.3d 863,

873 (7th Cir. 2000)). But a failure to explicitly consider the effects of obesity may be harmless error. *Id.*

In *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004), the ALJ did not address the claimant's obesity but did adopt "the limitations suggested by the specialists and reviewing doctors" who were aware of the condition. That, combined with the claimant's failure to "specify how his obesity further impaired his ability to work," made the error harmless: "although the ALJ did not explicitly consider [the claimant's] obesity, it was factored indirectly into the ALJ's decision as part of the doctors' opinions." *Skarbek*, 390 F.3d at 504.

Similarly, in *Prochaska*, the ALJ did not explicitly address the claimant's obesity, but the ALJ specifically predicated his decision upon the opinions of physicians who did discuss her weight, and a number of other medical reports relied upon by the ALJ noted her height and weight. *Prochaska v. Barnhart*, 454 F.3d 731, 736-37 (7th Cir. 2006). No medical opinion in the record identified Prochaska's obesity as significantly aggravating her back injury or contributing to her physical limitations. *Id.* at 737. Prochaska also failed to point to any other evidence suggesting that her obesity exacerbated her physical impairments. *Id.* The Seventh Circuit held that because Prochaska failed to "specify how [her] obesity further impaired [her] ability to work," and because the record relied upon by the ALJ sufficiently analyzed her obesity, any error on the ALJ's part was harmless. *Id.*

Herrold did not specifically claim obesity as an impairment. However, the records reflect that Herrold suffered from obesity. In fact, the ALJ specifically referenced the fact that in November 2007, Dr. Uddin indicated that Herrold suffered from obesity. (Tr. 31). And, the ALJ identified the fact that during Herrold's May 2008 consultative examination with Dr. Siddiqui,

Herrold was 61 inches tall and weighed 196 pounds. (Tr. 32).  Thus, there were references to Herrold's obesity and weight/height ratio in the records which the ALJ relied on in making her decision. Therefore, where the circumstances of *Skarbek* and *Prochaska* allowed the Seventh Circuit to conclude that the ALJ indirectly factored in the claimant's obesity, in this case, the Court is able to similarly conclude that the ALJ factored Herrold's obesity into her decision, especially where the ALJ explicitly mentioned Herrold's diagnosis of obesity.

In addition, although the medical opinions of record considered Herrold's weight, no medical opinion identified Herrold's obesity as significantly aggravating or contributing to her physical limitations beyond the pain and other limitations already considered by the ALJ.  And other than making the conclusory allegation that obesity can aggravate other impairments [DE 18 at 19; DE 24 at 9-10], Herrold does not articulate how obesity exacerbated her underlying conditions, played any significant role in her alleged inability to work, or would have changed the ALJ's five-step analysis.  Any remand for consideration of Herrold's obesity would not change the outcome of this case.  According, the ALJ's failure to explicitly address Herrold's obestiy in relation to her RFC does not require remand.

Lastly, the Court similarly rejects Herrold's argument that the ALJ was required to consult a medical expert or was required to re-contact Dr. Siddiqui.

The Social Security regulations indicate that an ALJ "may also ask for and consider opinions from medical experts" on the nature and severity of a claimant's impairments. 20 C.F.R. § 404.1527(f)(2)(3); *see also* HALLEX I-2-5-34 (indicating that an ALJ may need to obtain a medical expert when determining the severity of an impairment, the claimant's RFC, or if the ALJ has a question about the etiology or course of a disease or how it may affect the

47

claimant's ability to work). However, an ALJ is only required to re-contact medical professionals to testify if "the evidence received is inadequate to determine whether the claimant is disabled." *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004) (holding that the ALJ was not required to re-contact the treating physician for additional evidence or obtain medical expert testimony). Further, while an ALJ has a duty to make a complete record, this requirement can reasonably require only so much. *Scheck v. Barnhart*, 357 F.3d 697, 702 (7th Cir. 2004). In determining whether an ALJ has sufficiently developed the administrative record, courts "accept reasonable assessments by administrative officials about how much evidence is enough." *See Kendrick v. Shalala*, 998 F.2d 455, 457 (7th Cir. 1993) ("[I]t is always possible to do more. How much evidence to gather is a subject on which district courts must respect the [Commissioner's] reasoned judgment."). "Mere conjecture or speculation that additional evidence might have been obtained in the case is insufficient to warrant a remand." *Binion v. Shalala*, 13 F.3d 243, 246 (7th Cir. 1994).

In this case, the ALJ did not find it necessary to call in a professional other than the VE. Further, the ALJ acted within her discretion in determining that the evidence was adequate for her analysis in making a disability determination, based on the information from the testimony at the hearing and Herrold's extensive medical records. The ALJ did not error by not requesting additional information to make her disability determination, and simply stated, the record does not support Herrold's assertion that the ALJ inappropriately played doctor or that she relied on her layman's medical opinion.

Ultimately, the Court holds that the ALJ's RFC assessment was based on all of the relevant evidence in the record, and included an evaluation on both the evidence favoring the

48

finding of disability, as well as the evidence favoring the claim's rejection. 20 C.F.R. § 404.1545(a).  Further, the ALJ properly considered all of Herrold's medically determinable impairments, even if not considered "severe," 20 C.F.R. § 404.1545(a)(2), and the RFC is supported by substantial evidence.

**C.**     **Steps 4 and 5**

At step four, the ALJ decided that Herrold cannot perform her past work because the VE indicated that work as a child care attendant would require medium exertion. (Tr. 38, 80-81). Thus, the question became whether Herrold had the capability of performing other work in the national economy. *Tom v. Heckler*, 779 F.2d 1250, 1253 (7th Cir. 1985); 20 C.F.R. § 404.1520(g).

Herrold alleges that the ALJ made an erroneous step five decision by failing to account for all of her limitations in the hypotheticals posed to the VE, and because the VE provided inaccurate testimony upon which the ALJ then relied.

Hypothetical questions posed to vocational experts must include all limitations supported by medical evidence. *Steele v. Barnhart*, 290 F.3d 936, 942 (7th Cir. 2002).  As the Seventh Circuit explained in *O'Connor-Spinner*, when providing hypotheticals to a VE for the purpose of determining a claimant's ability to perform other jobs in the community, the ALJ must generally orient the VE to the claimant's limitations, particularly in relation to any credible limitations in the claimant's concentration, persistence, and pace. *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 619-21 (7th Cir. 2010) (noting exceptions when: it is clear that the VE was apprised of the limitation, either through review of the record or through observation at the hearing, and the VE was permitted to take the limitation into consideration when responding to the ALJ's questions,

49

or when the RFC clearly accommodates such limitations based on etiology); *see Craft*, 539 F.3d at 677-78 (restricting hypothetical to unskilled work did not consider difficulties with memory, concentration, or mood swings). The record must indicate that the VE was aware of the limitations and was permitted to testify with consideration of the same. *See O'Connor-Spinner*, 627 F.3d at 619-21.

In this case, the Court has determined that the ALJ's RFC determination was supported by the substantial evidence because the ALJ effectively translated the record evidence regarding Herrold's limitations into an RFC assessment, and no credible doctor's opinion, acceptable medical source opinion, or other source opinion contained in the record indicated greater limitations than those found by the ALJ. Thereafter, the ALJ used this exact RFC finding in the first hypothetical posed to the VE. Thus, this case is unlike the situation in *O'Connor-Spinner*, where the most restrictive hypothetical question posed by the ALJ to the VE did not include "a limitation on concentration, persistence or pace, although later in his written decision the ALJ listed this limitation in assessing Ms. O'Connor–Spinner's residual functional capacity." *O'Connor-Spinner v. Astrue*, 627 F.3d at 617-18. In this case, the least restrictive hypothetical question posed by the ALJ to the VE was entirely consistent with the ALJ's RFC finding, *compare* Tr. 81-82 *with* Tr. 27-38. Herrold's argument to the contrary is without merit, and the Court finds that the hypothetical accurately reflected Herrold's RFC, which permitted the VE to testify to the jobs that Herrold could perform based on all of her limitations.

Herrold also argues that the ALJ's ruling should be set aside because: (1) the ALJ failed to inquire whether the VE's testimony conflicted with the DOT prior to soliciting her substantive testimony, and (2) the VE's testimony conflicted with the DOT.

50

SSR 00–4p requires ALJs to inquire about conflicts between a VE's testimony and the DOT "before relying" on a VE's testimony, but does not specify whether this inquiry should (or must) occur before or after a VE testifies. SSR 00–4p ("[T]he adjudicator must elicit a reasonable explanation for the conflict before relying on the VE."). Other district courts have not read a temporal requirement into the Ruling 00-4p and have refused to establish a singular method by which ALJs must elicit potential conflicts. *See Howze v. Astrue*, 2010 WL 3075524 *1-2 (N.D. Ill. Aug. 3, 2010); *Harris v. Astrue*, 646 F.Supp.2d 979, 995 (N.D. Ill. 2009). Most recently, the Seventh Circuit considered this very issue and held "[w]hile we do not foreclose the possibility that an ALJ's inquiry into the consistency of a VE's testimony with the DOT could be rendered inadequate due to its timing in other circumstances, we find that the instructions given by the ALJ in this case were sufficient" where the ALJ's instruction addressed the issue of conflicting testimony before the VE offered her substantive testimony and the VE agreed under oath to identify and resolve any conflict between her testimony and the DOT. *Weatherbee v. Astrue*, 649 F.3d 565, 570 (7th Cir. 2011).

The Court's review of the transcript from the administrative hearing establishes that the ALJ satisfied the Ruling's requirement. The ALJ specifically asked the VE whether she was familiar with the social security regulations regarding vocational considerations, with jobs in the regional and national economy, and with the DOT, to which the VE responded in the affirmative. (Tr. 80). The ALJ then instructed the VE that "[i]f your testimony differs in anyway with information in the Dictionary of Occupational Titles, I need you to let me know that." *Id*. And the VE responded that she would. *Id*. Therefore, similar to the circumstances presented in *Weatherbee*, here too, the ALJ's instruction addressed the issue of conflicting testimony before

51

the VE offered her substantive testimony. The VE then agreed under oath to identify and resolve

any conflict between her testimony and the DOT.  Nothing in the hearing's transcript suggests

that the VE disregarded the ALJ's instructions.  Therefore, under these circumstances the

instructions given by the ALJ in this case were sufficient.

Herrold contends that the ALJ failed to resolve apparent conflicts between the VE's

testimony and the DOT because the VE erroneously testified that Herrold could perform the

duties of information clerks, inspectors, and assemblers, but the closest DOT entries for these

jobs include functional requirements that Herrold does not have—such as, frequent stooping,

standing for longer than 4 hours at a time, the ability to use medium exertion, or the ability to

work at a semi-skilled to skilled level. [DE 18 at 21-23; DE 23 at 11-13].  But Herrold does not

accurately portray the limitations that the ALJ placed in the hypothetical and the testimony given

in response by the VE.

SSR 00-4p requires ALJs to investigate and resolve any apparent conflict between the

VE's testimony and the DOT. SSR 00–4p;  *Weatherbee*, 649 F.3d at 570 (citing *Overman v.*

*Astrue*, 546 F.3d 456, 463 (7th Cir. 2008)). A conflict is apparent if it is "so obvious that the ALJ

should have picked up on [it] without any assistance." *Id*.  When there is an apparent conflict,

ALJs are required to obtain reasonable explanations for the conflict. *Id*.

The Court recognizes that a full range of light work requires lifting no more than 20

pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds, and

"requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour

workday." 20 C.F.R. § 404.1567(b); SSR 83-10.  However, the ALJ restricted her first

hypothetical to a person who could do less than a full range of light work by limiting the

hypothetical to someone who could lift a maximum of 10 pounds occasionally and frequently; could stand and walk up to 4 hours, no more than 2 hours at a time; could sit at least 6 hours, no more than 1 hour at a time; could not climb ladders, ropes, or scaffolds; could occasionally kneel, crouch, crawl, stoop, and climb ramps or stairs; and could not work around heights or hazards.  (Tr. 81).

In response to the ALJ's hypothetical, the VE testified that "based on that hypothetical" there would be approximately 1,200 information clerk positions, 1,200 inspection type positions, and 200 assembly type positions available. (Tr. 81).

The ALJ then asked the VE whether these jobs were unskilled, to which the VE responded in the affirmative. (Tr. 81).  The ALJ then verified that these jobs fell within the light exertional level, but were still within the lifting and standing restrictions given, to which the VE again responded in the affirmative. (Tr. 81-82).

Thus, contrary to Herrold's misrepresentation of the testimony, the VE did not draw her conclusions based on a hypothetical person who could perform a full range of light work, nor did the VE testify that Herrold could perform all information clerk, inspection, and assembly jobs. When one reads the VE's testimony in context, it is clear that although the VE did not provide DOT listing numbers, the VE's discussion referred to these "types" of positions.  This testimony clearly meant that when the VE testified to the number of jobs that Herrold could perform, the VE was only referring to a subset of jobs within the DOT's broad job category descriptions.  The fact that there are a large number of jobs that are beyond the capabilities of Herrold's RFC is not sufficient to establish an apparent conflict between the VE's testimony and the DOT, because the VE focused specifically on the type of work that Herrold could perform.  *See Weatherbee*, 649

53

F.3d at 572.  The transcript reveals that the VE specifically considered the limitations posed in

the hypothetical question which concerned a more limited range of light work capacity, as set

forth by the ALJ in her hypothetical (and ultimately in her RFC finding).  Moreover, the ALJ

made certain that the VE considered the restrictions set forth in her hypothetical, and the VE

confirmed that her responses were based on unskilled work that included the restrictions

provided by the ALJ.  Because there was no apparent conflict with the VE's testimony and

Herrold did not present evidence establishing that she could not work the types of jobs identified

by the VE, the ALJ did not err by relying on the VE's opinion.

Finally, the Court recognizes that the ALJ mistakenly indicated that there were 1,500

assembler type jobs available, when in fact, the VE testified that there were only 200 assembler

type jobs available. *Compare* Tr. 39 *with* Tr. 81.  However, the Seventh Circuit has stated that, in

the context of step five of the disability benefits analysis, "it appears well-established that 1,000

jobs" constitutes a significant number. *Liskowitz v. Astrue*, 559 F.3d 736, 743 (7th Cir. 2009).

Here, the VE stated that an individual with Herrold's limitations could work in some information

clerk, assembler, and inspector jobs, and that there were approximately 2,600 of these positions

available in the region—a number above the threshold for significance.

As stated above, the VE was properly oriented to the totality of Herrold's limitations (as

reflected in the RFC and resulting hypothetical question) and the VE was permitted to include

these limitations in her response to the ALJ's hypothetical.  Because Herrold has failed to

establish that there were apparent conflicts between the VE's testimony concerning jobs that she

could perform, the ALJ did not err when she accepted the VE's estimates and found that Herrold

was capable of working in positions that are available in significant numbers.  As a result, the Court concludes that there is no basis for a remand.

### IV.  Conclusion

For the aforementioned reasons, Herrold's motion for remand is DENIED. [DE 1].

Accordingly, the Commissioner's decision will be AFFIRMED.  The Clerk is DIRECTED to enter judgment in favor of the Commissioner and against Ms. Kathleen Herrold.

SO ORDERED.

ENTERED:  March 21, 2012

_____/s/ JON E. DEGUILIO_____
Judge
United States District Court